UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KENNY BAKER, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>v.<br><br>BARCLAYS PLC, BARCLAYS BANK PLC, JAMES E STALEY, C.S. VENKATAKRISHNAN, TUSHAR MORZARIA, STEVEN EWART, TIM THROSBY, ANNA CROSS, NIGEL HIGGINS, ALEX THURSBY, HELEN KEELAN, HÉLÈNE VLETTER-VAN DORT, JEREMY SCOTT, and MARIA RICHTER,<br><br>      Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, Kenny Baker, by and through his attorneys, allege the following upon information and belief, except as to allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes, without limitation, review and analysis of: (a) public filings made by Barclays PLC ("BPLC") with the U.S. Securities and Exchange Commission (the "SEC"); (b) press releases, shareholder communications, Annual General Meeting ("AGM") statements, postings on Barclays' investor relations website, and other public statements disseminated by Defendants (as defined below); (c) public filings made by Barclays Bank PLC ("BBPLC" and together with BPLC, "Barclays" or the "Company") with the SEC; (d) news articles and analyst reports concerning Barclays; and (e) other publicly available information concerning Barclays and the other Defendants (defined below).

**NATURE OF THE ACTION**

1.      This is a federal securities class action alleging claims against Barclays and certain of its officers and directors (collectively "Defendants") for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and for violations of Sections 5, 11, 12(a), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77e, 77l(a), 77k and 77o on behalf of a class (the "Class"), of all persons or entities who purchased or otherwise acquired Barclays Bank PLC iPath Series B S&P 500 VIX Short-Term Futures ETN ("VXX") during the period of February 21, 2019 through September 19, 2022, both dates inclusive (the "Class Period"). Excluded from the Class are Defendants in this action, the officers and directors of the Company during the Class Period (the "Excluded D&Os"), members of Defendants' and Excluded D&Os' immediate families, legal representatives, heirs, successors or assigns, and any entity in which Defendants or the Excluded D&Os have or had a controlling interest.

2.      BPLC is a British universal bank, offering consumer banking and payments services in the United Kingdom ("U.K."), United States ("U.S."), and Europe, as well as global corporate and investment banking services.

3.      BPLC, through its subsidiary BBPLC, is the issuer of the iPath Series B S&P 500 VIX Short-Term Futures ETN, an exchange-traded note ("ETN") designed to provide exposure to the S&P 500 VIX Short-Term Futures Index Total Return (the "Index").

4.      On March 28, 2018, BBPLC filed an amended registration statement for over $21.3 billion (the "2018 Shelf") worth of securities, including VXX.  On June 14, 2019, BBPLC filed a

registration statement registering an additional $20.7 billion worth of securities, including VXX, that could be sold over the ensuing three years (the "2019 Shelf").[1]

5.      BBPLC 2018 Annual Report on Form 20-F, filed with the SEC on February 21, 2019 ("2018 BBPLC 20-F"), BBPLC 2019 Annual Report on Form 20-F, filed with the SEC on February 14, 2020 ("2019 BBPLC 20-F"), BBPLC 2020 Annual Report on Form 20-F, filed with the SEC on February 18, 2021 ("2020 BBPLC 20-F"), and BBPLC 2021 Annual Report on Form 20-F, filed with the SEC on February 23, 2022 ("2021 BBPLC 20-F"), which were incorporated by reference into the 2019 Shelf Registration Statement, represented to investors that BBPLC's internal controls over financial reporting were effective.

6.      BPLC 2018 Annual Report on Form 20-F, filed with the SEC on February 21, 2019 ("2018 BPLC 20-F"), BPLC 2019 Annual Report on Form 20-F, filed with the SEC on February 13, 2020 ("2019 BPLC 20-F"), BPLC 2020 Annual Report on Form 20-F, filed with the SEC on February 18, 2021 ("2020 BPLC 20-F"), and BPLC 2021 Annual Report on Form 20-F, filed with the SEC on February 23, 2022 ("2021 BPLC 20-F"),  further informed investors that Barclays' internal controls over financial reporting were effective.

7.      However, the statements in the above referenced filings were materially false and misleading, or failed to disclose material information necessary to make statements in the 2019 Shelf Registration and Forms 20-F not misleading, in violation of Section 10(b) of the Exchange Act (and Rule 10b-5), and in violation of Sections 5, 11, and 12(a) of the Securities Act.

8.      As Barclays has since admitted, at the end of the Class Period, Barclays had a material weakness in its internal controls over financial reporting, as evidenced by the fact that Barclays issued and sold approximately $17.64 billion in unregistered securities over and above

---

[1] The 2019 Shelf Registration Statement became effective on August 1, 2019.

the maximum amount of securities registered in the 2018 and 2019 Shelf Registrations, the over-issuance was not timely discovered, and a subsequent recission offer made by Barclays could not be carried out effectively.

9.      Given the potential exposure to the securities laws and legal liability from the issuance of unregistered securities, the failure to have controls in place to account for the number of securities issued against the number of securities registered is such an elementary failure of internal control that is so obvious as to be deliberately reckless.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 5, 11, 12, and 15 of the Securities Act (15 U.S.C. §§ 77e, 77k, 77l and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because this action is a civil action arising under the laws of the United States, Section 22 of the Securities Act (15 U.S.C. § 77v), and under Section 27 of the Exchange Act (15 U.S.C. § 78aa), which vests exclusive jurisdiction for violations of the Exchange Act in the District Courts of the United States.

12.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) for the following reasons:

(a) Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information, occurred in substantial part in this Judicial District;

(b) The depositary bank, trustee, and custodian for Barclays' VXX ETNs is the Bank of New York Mellon ("BNY Mellon"). BNY Mellon is headquartered in the State of New York and has its principal office in this District;

(c) The ETNs and the underlying indenture agreement, which governs the relationship among Barclays, NY Mellon, and the holders and beneficial owners of the ETNs, are governed by New York law;

(d) Barclays agent for service for its securities is the offices of BBPLC located within this Judicial District; and

(e) According to Barclays' website, Barclays has Corporate Bank and Investment Bank employees and/or offices based in this Judicial District.

13.     In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of the national securities exchanges.

## PARTIES

### Plaintiff

14.     Plaintiff Kenny Baker ("Mr. Baker" or "Plaintiff") is an individual who resides in Houston, Texas. Mr. Baker is a C.P.A., sophisticated investor, and entrepreneur who owns and manages multiple businesses. Mr. Baker purchased VXX ETNs on the Chicago Board Options Exchange ("CBOE"), during the Class Period.

**Defendants**

    **Exchange Act Defendants**

15.    Defendant Barclays PLC ("BPLC") is a bank holding company, headquartered in London, United Kingdom. BPLC provides various financial services, including investment banking, wealth management, and the offer and sale of securities.

16.    Defendant Barclays Bank PLC ("BBPLC") is BPLC's wholly owned United States subsidiary, headquartered in New York, New York. BBPLC is the non-ring-fenced bank of BPLC and consists of a corporate and investment banking division, a consumer, cards, and payment division, and a private bank. BBPLC is the issuer of the iPath Series B S&P 500 VIX Short-Term Futures ETN ("VXX"), an exchange-traded note ("ETN") designed to provide exposure to the S&P 500 VIX Short-Term Futures Index Total Return (the "Index").

17.    Defendant James E Staley ("Staley") served as the Chief Executive Officer ("CEO") of Barclays and a Director on BPLC' Board of Directors ("BPLC Board") from December 1, 2015 through October 31, 2021. From March 2019 through October 31, 2021, Staley also served as CEO of BBPLC and a Director on BBPLC's Board of Directors ("BBPLC Board") until January 31, 2019. During his tenure, Staley signed a certification pursuant to 17 C.F.R. § 240.13(A)-14(A) that was attached to the 2020 BPLC 20-F as Exhibit 12.1, and a certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. § 1350) that was attached to the 2020 BPLC 20-F as Exhibit 13.1, which are alleged to contain materially false and misleading statements or omit material information in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and incorporated by reference into the 2019 Shelf Registration Statement. Staley also signed 2020 BBPLC's certification pursuant to 17 C.F.R. § 240.13(A)-14(A) that was attached to the 2020 BBPLC 20-F as Exhibit 12.1, and a certification

pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. § 1350) that was attached to the 2020 BBPLC 20-F as Exhibit 13.1, which are alleged to contain materially false and misleading statements or omit material information in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and incorporated by reference into the 2019 Shelf Registration Statement.

18.    Defendant C.S. Venkatakrishnan ("Venkatakrishnan" or "Venkat") has served as the CEO of BPLC, a member of its Executive Committee, and a Director on the BPLC Board since November 1, 2021. Venkatakrishnan has also served as the CEO of BBPLC and as a Director on the BBPLC Board since November 1, 2021. Prior to his position as CEO, Venkat served as Barclays' Global Head of Markets from October 2020 to October 2021, and the Company's Chief Risk Officer from March 2016 to October 2020, which included the entire time Barclays was an ineligible issuer (May 2017 – May 2020). During his tenure as CEO, Venkat signed Barclays' annual reports and certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") stating that the financial information contained in the Company's annual reports was accurate and disclosed any material changes to the Company's internal controls over financial reporting, which were incorporated by reference into the 2019 Shelf Registration. Statement. Venkat was a direct and substantial participant in the scheme.

19.    Defendant Tushar Morzaria ("Morzaria") served as Barclays' Group Finance Director (the most senior finance position at Barclays), a member of its Executive Committee, and as a Director on the BPLC and BBPLC Boards. Morzaria retired from Barclays' Boards, and as Group Finance Director effective April 22, 2022.  Currently, Morzaria is Chairman of the Global Financial Institutions Group of Barclays' Investment Bank. During his tenure, Morzaria signed Barclays' annual reports and certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX")

stating that the financial information contained in the Company's annual reports was accurate and disclosed any material changes to the Company's internal controls over financial reporting, which were incorporated by reference into the 2019 Shelf Registration Statement. Morzaria was a direct and substantial participant in the scheme.

20.     Defendant Steven Ewart ("Ewart") has served as the CFO of BBPLC since August 10, 2018. Following Ewart's appointment as CFO of BBPLC and required regulatory approval, Defendant Ewart signed 2019 Shelf Registration Statements.

21.     Defendant Tim Throsby (Throsby") has served as BBPLC's CEO since January 31, 2019.  Following Defendant Throsby's appointment as CEO of BBPLC and required regulatory approval, Staley resigned as CEO and Director of BBPLC, remaining as CEO and Director of BPLC.

22.     Defendant Anna Cross ("Cross") has served as the Group Finance Director at Barclays (the most senior finance position), since April 2022 and as a member of its Executive Committee during that time. Prior to that appointment, Cross served as Deputy Finance Director, Group Financial Controller, and Chief Financial Officer of Barclays. Cross was a direct and substantial participant in the scheme.

23.     Defendants Staley, Venkatakrishnan, Morzaria, Ewart, Throsby and Cross are referred to herein as the "Individual Defendants" and, together with the Company and the Section 20(a) Defendants (defined below), are collectively referred to herein as "Defendants." The Individual Defendants made, or caused to be made, material misstatements and omissions that either artificially inflated and/or artificially maintained the price of Barclays' VXX ETNs during the Class Period.

24.     The Individual Defendants, because of their positions within Barclays, possessed the power and authority to control the contents of the Company's reports to the SEC, shareholder letters, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. Each of the Individual Defendants was provided with copies of and/or contributed to the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or caused them to be corrected. Because of their positions, and their access to material non-public information available to them but not to the public, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations and omissions being made were materially misleading. The Individual Defendants are liable for the misleading statements and material omissions pleaded herein.

25.     Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, acquisition plans, and present and future business prospects, as alleged herein. In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the misleading statements and information alleged herein, were aware of, or recklessly disregarded, the misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

**The Securities Act Defendants**

26.     Until January 31, 2019, Defendant Staley served as CEO and Director of BBPLC. Defendant Staley signed the 2019 Shelf Registration Statement.

27.     Defendant Nigel Higgins ("Higgins") has served as the "Group Chairman" at Barclays since May 2019 (a position known as the "Chairman of the Board" in the U.S.), and as a Director on the Barclays Boards for three months prior to that appointment (starting in March 2019). Defendant Higgins signed the 2019 Shelf Registration Statement.

28.     Defendant Ewart has served as the CFO of BBPLC since August 10, 2018. Following Defendant Ewart's appointment as CFO of BBPLC and required regulatory approval, Defendant Ewart signed the 2019 Shelf Registration Statements.

29.     Defendant Throsby has served as BBPLC's CEO since January 31, 2019. Following Defendant Throsby's appointment as CEO of BBPLC and required regulatory approval, Defendant Staley resigned as CEO and Director of BBPLC, remaining as CEO and Director of BPLC. Defendant Throsby signed the 2019 Shelf Registration Statements.

30.     Defendant Alex Thursby ("Thursby") has been a BBPLC non-executive director since April 1, 2018.  Defendant Thursby signed the 2019 Shelf Registration Statements.

31.     Defendant Helen Keelan ("Keelen") has been a BBPLC non-executive director since April 1, 2018.  Defendant Keelan signed the 2019 Shelf Registration Statements.

32.     Defendant Hélène Vletter-van Dort ("Vletter-van Dort") has been a BBPLC non-executive director since April 1, 2018.  Defendant Vletter-van Dort signed the 2019 Shelf Registration Statements.

33.     Defendant Jeremy Scott ("Scott") has been a BBPLC non-executive director since April 1, 2018.  Defendant Scott signed the 2019 Shelf Registration Statements.

34.     Defendant Maria Richter ("Richter") has been a BBPLC non-executive director since April 1, 2018.  Defendant Richter signed the 2019 Shelf Registration Statements.

**Section 20(a) Control Person Defendants**

35.     Defendants Higgins, Staley, Venkatakrishnan, Ewart, Throsby, and Cross are together referred to as the "Section 20(a) Defendants."

## BACKGROUND FACTS

**Company Background**

36.     Headquartered in London, United Kingdom, Barclays is a transatlantic consumer and wholesale bank with global reach offering products and services across person, corporate and investment banking, credit cards, and wealth management. BBPLC is BPLC's wholly owned U.S.-based subsidiary with its headquarters in New York, New York.

37.     Throughout the Class Period, BBPLC, met the conditions set forth in General Instruction I(1)(a) and (b) of Form 10-K, as applied to annual reports on Form 20-F, and therefore filed Forms 20-F with a reduced disclosure format.  On April 1, 2018, BBPLC was established as Barclays' non-ring-fenced bank.[2]  As of the same date, BBPLC inducted a new board of independent non-executive directors.

38.     In 2019, the Barclays Board and BBPLC Board merged and the BBPLC Board members are a subset of the Barclays Board members. Each member of the Barclays Board, except the Senior Independent Director, Brian Gilvary, and the Chairman of Barclays Bank UK PLC, Crawford Gillies, also serve on the BBPLC Board.

39.     As a result of the consolidation, the Barclays Board Audit Committee and BBPLC Board Audit Committee were also consolidated, and BBPLC matters are covered in concurrent meetings. One of the roles of the Barclays Board Audit Committee is to evaluate the effectiveness of Barclays' internal controls over financial reporting.

---

[2] 2018 BBPLC 20-F at 1.

**Barclays' VXX ETNs**

40.     BPLC, through its subsidiary BBPLC, is the issuer of the iPath Series B S&P 500 VIX Short-Term Futures ETN, an ETN designed to provide exposure to the VIX Index.

41.     VXX ETNs are highly complex products. These products are typically designed to track Chicago Board Options Exchange Volatility Index (VIX) futures, rather than the oft-cited CBOE Volatility Index, or VIX, itself.

42.     The VIX estimates expected market volatility over the next 30 days by tracking options linked to the benchmark U.S. S&P 500 stock index. Historically, the VIX tends to be elevated in periods of market distress and lower under normal market conditions, and it often moves sharply higher when stock indices decline significantly. For this reason, it's often referred to as the market's "fear gauge."

43.     While VIX futures prices are generally highly correlated with movements in the VIX, they do not track it one-for-one and their degree of correlation can depend on the maturity date. VIX futures price "sensitivity" to the underlying VIX may be quite a bit less than some investors might expect, and this sensitivity generally gets weaker the farther out the futures go.

44.     Barclays explains that VXX is:

> designed to provide exposure to the S&P 500® VIX Short-Term Futures TM Index Total Return (the "Index").  The ETNs are riskier than ordinary unsecured debt securities and have no principal protection.  The ETNs are unsecured debt obligations of the issuer, Barclays Bank PLC, and are not, either directly or indirectly, an obligation of or guaranteed by any third party.  **Any payment to be made on the ETNs, including any payment at maturity or upon redemption, depends on the ability of Barclays Bank PLC to satisfy its obligations as they come due.**[3]  An investment in the ETNs involves significant risks, including possible loss of principal and may not be suitable for all investors.

---

[3] Emphasis added.

The Index is designed to provide access to equity market volatility through CBOE Volatility Index® (the "VIX Index") futures. The Index offers exposure to a daily rolling long position in the first and second month VIX futures contracts and reflects market participants' views of the future direction of the VIX index at the time of expiration of the VIX futures contracts comprising the Index. Owning the ETNs is not the same as owning interests in the index components included in the Index or a security directly linked to the performance of the Index.

45.     Generally, ETNs are used as short-term trading products because they can degrade significantly over time, and are not designed to be used as a buy-and-hold investment.

**Barclays "Well-Known Seasoned Issuer" Status**

46.     In 2005, in its Securities Offering Reform release, the SEC adopted modifications to the registration, communications and offering processes under the Securities Act. One of the reforms in the SEC's 2005 modifications was the adoption of a new category of issuer—the "well-known seasoned issuer" or, for short, "WKSI." The SEC designed WKSI to apply to the most widely followed issuers representing the most significant amount of capital raised and traded in the United States.

47.     Under Securities Act Rule 405, a WKSI is an issuer that meets the registrant requirements of Form S-3 or Form F-3 and either: (1) "[a]s of a date within 60 days of determination date, has a worldwide market value of its outstanding voting and non-voting common equity held by non-affiliates of $700 million or more"; or (2) "as of a date within 60 days of the determination date, has issued in the last three years at least $1 billion aggregate principal amount of non-convertible securities, other than common equity, in primary offerings for cash, not exchange, registered under the [Securities] Act." 17 C.F.R. § 230.405.

48.     Issuers who are WKSIs benefit from the flexible communications and registration rules and regulations in the 2005 Securities Offering Reform, most notably that WKSIs may register their securities offerings on shelf registration statements that become effective

automatically upon filing. In practice, this reform means there is no requirement for WKSIs to wait for the Division of Corporation Finance at the SEC to review the registration statement and declare it effective before the WKSI is permitted to make offers and/or sales from that registration statement, a process that may take several weeks or months to conclude.

49.     To qualify as a WKSI, an issuer must not be an "ineligible issuer." Rule 405 defines an "ineligible issuer" to be, among other characteristics, an issuer that has (or whose subsidiary has) been convicted of a felony or misdemeanor specified in four enumerated provisions under Section 15 of the Exchange Act or an issuer that has violated (or whose subsidiary has violated) the anti-fraud provisions of the federal securities laws (or that are subject of a judicial or administrative decree or order prohibiting certain conduct or activities involving the anti-fraud provisions of federal securities laws) within the last three years. Ineligible issuer status attaches automatically upon a securities violation.[4]

50.     Yet, despite the automatic imposition of ineligible issuer status, Rule 405 permits the SEC to grant waivers of ineligible issuer status "upon a showing of good cause, that it is not necessary under the circumstances that the issuer be considered an ineligible issuer." Since the 2005 Offering Reform, the SEC has liberally granted ineligible issuer status waivers, permitting companies, including Barclays, to retain their WKSI status despite violating the federal securities laws.

---

[4] Although not relevant here, issuers also may lose WKSI status and become an "ineligible issuer" if they: (a) fail to timely file periodic reports for 12 calendar months; (b) default on debt or long-term leases; or (c) their public float falls below $700 million, and they have more than $1 billion in principal of non-convertible debt securities in primary offerings. See 17 C.F.R. § 230.405.

**Barclays' Structured Note and ETN Offerings**

51.      Historically, Barclays has offered and sold securities in the United States pursuant to an effective shelf registration statement on Form F-3.

52.      A shelf registration statement is a filing with the SEC to register a public offering, usually where there is no present intention to immediately sell all of the securities being registered. A shelf registration statement permits multiple offerings based on the same registration.

53.      The Barclays shelf registration statement is largely used by BBPLC's Structured Products Group for the offer or sale of ETNs and structured notes.[5]  A structured note is a debt security whose return is based on equity indexes, a single equity, a basket of equities, interest rates, commodities, or foreign currencies.  Every structured note has two components: a bond and a derivative.

54.      On occasion, the Group Treasury at Barclays also uses the shelf registration statement to sell corporate debt securities.[6]

55.      On May 10, 2017, the SEC instituted public administrative and cease-and-desist proceedings against Barclays Capital Inc.—a subsidiary of BBPLC—arising out of its former wealth and investment management business. In *In the Matter of Barclays Capital Inc.*, Adm. Proc. File No. 3-17978 (May 10, 2017), Barclays agreed to pay $97 million to the SEC for overcharging clients for mutual funds, in connection with settling the action.

56.      As a result of that settlement, Barclays automatically became an ineligible issuer under Rule 405 and lost its status as a WKSI for a period of three (3) years. *See* 17 C.F.R. § 230.405.

---

[5] SEC Order, ¶16.
[6] SEC Order, ¶16 (Sept. 29, 2022), available at https://www.sec.gov/litigation/admin/2022/33-11110.pdf

57.     Loss of WKSI status meant that, among other things, Barclays would be unable to file automatically effective shelf registration statements. Thus, Barclays could no longer register indeterminate amounts of different types of securities on immediately effective registration statements. Additionally, loss of WKSI status meant that Barclays could no longer use an automatic shelf registration statement and pay filing fees on a "pay-as-you-go" basis at the time of each takedown off the shelf. This forced Barclays, as a practical matter, to quantify the total amount of securities that they planned to offer in order to pay the registration fees for those securities in advance. This also meant that Barclays needed to track the amount of securities that they sold over the duration of the shelf to ensure that they did not exceed the amount registered.

58.     Following the loss of WKSI status, according to the SEC, BBPLC personnel understood the consequences of this status change – that Barclays had to track actual offers and sales of securities on a real-time basis.[7] These consequences included implementing an internal mechanism to track offers and sales of securities off any shelf, relative to the registered amount of securities available to be offered or sold off that shelf, in order to ensure that no securities in excess of the amount registered were offered or sold.[8]

59.     On February 22, 2018, Barclays filed an amended registration statement to convert its prior 2016 WKSI shelf to a non-WKSI shelf, 2018 Shelf, which was declared effective on March 30, 2018.[9] The 2018 Shelf included a specification of the maximum aggregate offering price of securities available to be offered or sold from the 2018 Shelf.

---

[7] SEC Order, ¶19.
[8] *Id.*
[9] *See* Barclays' March 2018 Shelf Registration Statement (Mar. 30, 2018), available at www.sec.gov/Archives/edgar/data/312070/000119312518098676/d450194dposam.htm; Notice of Effectiveness (Mar. 30, 2018), available at www.sec.gov/Archives/edgar/data/312070/999999999518000718/xslEFFECTX01/primary_doc.xml.

60.     On June 14, 2019, Barclays filed another shelf registration statement for a new non-WKSI shelf, the 2019 Shelf, to replace the 2018 Shelf.[10] The 2019 Shelf was declared effective on August 1, 2019, and registered $20.76 billion of debt securities.[11]

61.     The securities registered and issued pursuant to the 2019 Shelf consisted of structured noted and ETNs.[12]

62.     Pursuant to the terms of both the 2018 Shelf and 2019 Shelf, Barclays was required to track the aggregate amount of securities that were offered and sold from each respective shelf on a real-time basis, thereby ensuring that Barclays did not offer or sell any securities in excess of what had been registered.

**Barclays Non-WKSI Status Working Group**

63.     Following the May 2017 SEC cease-and-desist proceedings and order, Barclays needed to address its loss of WKSI status with respect to its ongoing securities offerings in the United States. Barclays self-reported that, in or around January 2018, it formed a working group ("Working Group") "that included trading desk heads from the Structured Products Group, personnel from an administrative support function called business management, personnel from the product origination group, a member of the compliance department, and a member of the legal department."[13] The Working Group endeavored to calculate the total amount of securities they

---

[10] *See* Barclays June 14, 2019 Shelf Registration Statement (June 14, 2019), available at https://www.sec.gov/Archives/edgar/data/312070/000119312519173793/d756161df3.htm.
[11] *See* Barclays August Shelf 2019 Registration Statement (Aug. 1, 2019), available at www.sec.gov/Archives/edgar/data/312070/000119312519206925/d778493df3a.htm; Notice of Effectiveness (Aug. 1, 2019), available at www.sec.gov/Archives/edgar/data/312070/999999999519001783/xslEFFECTX01/primary_doc.xml.
[12] Generally, ETNs are commonly short-term trading products that can degrade significantly over time and are not designed to be used as a long-term buy-and-hold investment.
[13] SEC Order, ¶20.

anticipated selling for Barclays shelf registration statements in 2018 and 2019 for its U.S. structured note business during Barclays period as an ineligible issuer.

64.     The Working Group principally focused on two issues. First, the Working Group considered whether to amend the existing registration statement to convert the existing WKSI shelf into a non-WKSI shelf for approximately 18 months or to file a new registration statement to register a new, non-WKSI shelf for three years.[14]   The Working Group concluded that the shelf conversion was the better option and converted the WKSI shelf into what eventually became the 2018 Shelf.[15]

65.     Second, the Working Group worked with the trading desks that would be using the 2018 Shelf in their business, as well as Group Treasury, to calculate the total amount of securities that they anticipated offering and selling over the next approximately 18 months, given that Barclays sought to register the total amount of securities that it anticipated offering and selling during that period and pay the registration fees for that amount of securities in advance.[16]   As part of these calculations, the Working Group also determined an initial allocation of fees among the trading desks accessing the 2018 Shelf, with the expectation that these allocations would be revisited as data regarding actual offers and sales off of the 2018 Shelf became available.

66.     On March 28, 2018, Barclays filed a post-effective amendment, which amended its prior registration statement on Form F-3, and on March 30, 2018, Barclays' post-effective amendment was declared effective.[17]   The filing fees for the 2018 Shelf covered the offer or sale of approximately $21.3 billion of securities, for a period of approximately 18 months.[18]

---

[14] *Id.* at ¶21.
[15] *See Id.*
[16] *Id.* at ¶22.
[17] *Id.* at ¶23.
[18] *Id.*

67.     While performing the work described herein, members of the Working Group recognized, discussed and understood the need to track actual offers and sales of securities against the amount of registered securities on a real-time basis.[19]  Nevertheless, no internal control was established to track offers and sales of securities, nor was any member of the Working Group or other BBPLC personnel performing that task.[20]

68.     As the 2018 Shelf approached its expiration in 2019, the Working Group reconvened with largely the same membership as in 2018.[21] As during the 2018 WKSI shelf conversion, the Working Group calculated the total amount of securities that they anticipated offering or selling during the three-year duration of what would become the 2019 Shelf and determined an initial allocation of fees among the trading desks accessing the 2019 Shelf.

69.     Unlike during its work in 2018, however, the Working Group's 2019 Shelf work required it to perform "Carry-Over Calculations."[22]

70.     The Carry-Over Calculations were necessary because the 2018 Shelf had excess securities still available to offer or sell.[23] Accordingly, the Working Group needed to determine two amounts: (1) how much was needed for offers or sales of securities from the 2018 Shelf during the time between when Barclays filed the 2019 Shelf Registration Statement and when the 2019 Shelf became effective ("Gap Period"); and (2) how many securities would be left over on the 2018 Shelf after accounting for the anticipated Gap Period offers or sales. [24]  Barclays de-registered

---

[19] SEC Order, at ¶24.
[20] *Id.*
[21] *Id.* at ¶25.
[22] *See id.*
[23] *Id.* at ¶26.
[24] *See id.*

those remaining securities and used the fees that were originally assessed on those securities to offset a portion of its registration fees due for the 2019 Shelf Registration Statement.[25]

71.     The Carry-Over Calculations also required knowing how many securities were already issued under 2018 Shelf.  The Working Group had to calculate that amount manually, as well as estimate the forward-looking amounts, because there was no internal control in place to monitor the issuance of securities under a shelf registration statement.

72.     On August 1, 2019, Barclays' registration statement on Form F-3 was declared effective.[26]  The filing fees for the 2019 Shelf Registration Statement covered the offer or sale of approximately $20.8 billion of securities, for a period of three years.[27]

73.     Despite the labor-intensive work to manually calculate the Carry-Over Calculations and the payment of registration fees related to the 2019 Shelf, Barclays failed to establish any internal control to track offers and sales of securities on a real-time basis and no member of the Working Group or other Barclays personnel was performing that task.[28]

**Barclays Over Issues Securities in Excess of the 2018 and 2019 Shelf Registration Statements**

74.     According to the SEC Order, on March 8, 2022, a member of Group Treasury reached out to the member of the legal department who had been part of the Working Group, inquiring as to how many securities remained available to be offered and sold off the 2019 Shelf because Group Treasury was planning on doing a sale of corporate debt securities. [29]

75.     Shortly thereafter, Barclays made several attempts to calculate the cumulative amount of securities offered and sold from the 2019 Shelf in order to determine the amount of

---

[25] SEC Order, at ¶26.
[26] *Id.* at ¶27.
[27] *See id.*
[28] *Id.* at ¶28.
[29] *Id.* at ¶29.

securities that remained available for sale.[30] The SEC Order states that as a result of these calculation efforts, it was "<u>clear to all involved that there was **no internal control in place** to track in real time the amount of securities offered and sold against the amount of securities registered</u>."[31]

76.    Then, on or around March 9, 2022, Barclays concluded that securities had been offered and sold in excess of what had been registered on the 2019 Shelf, and Barclays needed to halt new offers and sales of securities from that shelf, effectively suspending its structured note business.[32]

77.    Five days later, on March 14, 2022, Barclays notified regulators about the over-issuance and announced to investors that it did not have sufficient issuance capacity to support further sales from inventory and any further issuances of the VXX and OIL ETNs.[33]  However, Barclays did not disclose the over-issuance at this time, but instead merely stated that it "does not currently have sufficient issuance capacity to support further sales from inventory and any further issuance of the ETNs." Without a public disclosure of the over-issuance the market was left in the dark for two more weeks.[34]

78.    That announcement further stated that "[t]his suspension may cause fluctuations in the trading value of [VXX]," but that "Barclays expect[ed] to reopen sales and issuances of [VXX] ETNs as soon as it c[ould] accommodate additional capacity for future issuances."  This explanation, though true, did not include any information regarding Barclays' failure to maintain

---

[30] *Id.* at ¶30.
[31] *Id.* (All emphasis has been added unless otherwise noted.).
[32] *See* SEC Order, ¶¶7, 29.
[33] *See id.* at ¶31.
[34] In fact, after the March 14, 2023 announcement demand for VXX ETNs surged with the market being none the wiser to the fact that billions worth of VXX ETNs were unregistered.

effective internal controls to track the offers and sales from the 2019 Shelf that caused the Company to issue approximately $15.2 billion worth of unregistered securities.

79.     Two weeks later, on March 28, 2022, Barclays filed a Form 6-K with the SEC and publicly disclosed details around its internal control issues, a forthcoming rescission offer to purchasers of unregistered securities in the over-issuance, and an estimate of potential financial impact of the over-issuance at around £450 million ($590 million).[35]  In the March 28, 2022 Form 6-K, Barclays also told the market that it commissioned an independent review of "the control environment related to such issuances" and that "regulatory authorities are conducting inquiries and making requests for information" concerning the over-issuance.

80.     On April 22, 2022 and April 28, 2022, Barclays issued press releases announcing the suspension of more than thirty (30) additional ETNs.

81.     Barclays revealed that the Carry-Over Calculations described above were incorrect because the Company had de-registered too large an amount of securities from the 2018 Shelf.[36] As a result, beginning on June 26, 2019, Barclays offered and sold approximately $1.3 billion of securities in excess of what had remained on the 2018 Shelf.[37]

82.     These miscalculations elongated the time period covered by the over-issuance due to Barclays' ineffective internal controls over financial reporting, and increased the total amount of the over-issuance.[38] In the end, the Company offered and sold approximately: (i) $16.37 billion of securities in excess of the amount registered with the SEC from the 2019 Shelf; and (ii) $1.3

---

[35] *See id.* at ¶32.
[36] *See id.* at ¶33.
[37] *Id.*
[38] *See id.* at ¶34.

billion of securities in excess of what had remained on the 2018 Shelf for (iii) a grand total of $17.7 billion in over-issuances.[39]

**Barclays Recission Offer**

83.     On August 1, 2022, before the market opened, Barclays filed a Form 424B5 with the SEC and commenced a Recission Offer for $17.6 billion over-issued securities that were sold pursuant to the 2018 and 2019 Shelf Registration Statements, whereby Barclays offered "to repurchase the applicable securities from relevant purchasers who acquired such securities, at their purchase price plus interest, less the amount of any interest, coupon payments, principal or other income received pursuant to the terms of the securities, or to pay rescissory damages if such securities, after being purchased, were sold, redeemed or matured at a loss." According to the Prospectus that Barclays filed with the SEC on August 1, 2022, as well as an amended thereto filed on August 12, 2022, the rescission offer applied to more than 3,000 structured notes and ETNs.

84.     The August 1, 2022 Form 424B5 disclosed that from February 18, 2021 through March 2022, Barclays sold approximately $16.37 billion of unregistered securities in excess of the maximum $20.8 billion of securities registered under the 2019 Shelf Registration Statement (for a total of approximately $37 billion).

85.     The August 1, 2022 Form 424B5 also disclosed that Barclays sold an additional $1.27 billion of unregistered securities in excess of the maximum aggregate amount registered pursuant to the 2018 Shelf Registration Statement.

86.     The Rescission Offer commenced on August 1, 2022 and expired on September 12, 2022.  Plaintiff, and other investors, attempted to take advantage of the Rescission Offer by properly

---

[39] SEC Order, at ¶34.

submitting claims to the Barclays portal before the stated deadline. Plaintiff and other members of the class received the same email – a notification that ***each of their claims*** had been rejected.

## DEFENDANTS MATERIALLY FALSE AND MISLEADING STATEMENTS

87.     The Class Period begins on February 21, 2019, when Barclays filed its 2018 annual reports on Forms 20-F with the SEC describing its control environment which was incorporated into the August 2019 Registration Statement.

88.     Throughout the Class Period, Defendants made materially false and misleading statements and failed to disclose material information about Barclays' heightened risk of selling unregistered securities, the over-issuance of securities by BBPLC, and the strength of Barclays internal controls and procedures.

### *2018 BPLC Annual Report on Form 20-F*

89.     On February 21, 2019, Barclays filed the 2018 BPLC 20-F.  The 2018 BPLC 20-F was signed by Defendant Morzaria.

90.     In the 2018 BPLC 20-F, Barclays described the Company's "improved" internal controls "notably following the completion of the Barclays Internal Controls Enhancement Programme (BICEP)" and that the "Control Environment is monitored by senior management and the Board via various reports, dashboards, and deep dives." And further stated that the "programme facilitated the resolution of the most material control issues, and implemented a system of tracking and reporting risk events and controls issues against a new Controls Maturity Model, which left the Company's internal controls environment in a much stronger position.[40]

91.     The 2018 BPLC 20-F further stated that the Company "is committed to operating within a strong system of internal control," and lays out eight "Principal Risks…: Credit risk,

---

[40] 2018 BPLC 20-F at 70.

Market risk, Treasury and Capital risk, Operational risk, Model risk, Reputation risk, Conduct risk and Legal risk." The 2018 BPLC 20-F went on to state that the Company's "frameworks, policies and standards enable Barclays to meet regulators' expectations relating to internal control and assurance."[41]

92.     The 2018 BPLC 20-F stated that the Barclays Board Audit Committee concluded that, [t]hroughout the year ended 31 December 2018 and to date, the Barclays Group has operated a system of internal control that provides reasonable assurance of effective operations covering all controls including financial and operational controls and compliance with laws and regulations."[42]

93.     The 2018 BPLC 20-F also stated that "Management has assessed the internal control over financial reporting as of 31 December 2018. In making its assessment, management utilized the criteria set out in the 2013 COSO framework and concluded that, based on its assessment, the internal control over financial reporting was effective as of 31 December 2018."[43]

94.     Attached as Exhibit 12.1 to the 2018 BPLC 20-F were certifications pursuant to 17 C.F.R. 240.13(A)-14(A) signed by Defendants Staley and Morzaria, which stated:

1.  I have reviewed this annual report on Form 20-F of Barclays PLC;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4.  The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules

---

[41] 2018 BPLC 20-F at 40.
[42] *Id*. at 40.
[43] *Id*.at 41.

13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and15d-15(f)) for the company and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5. The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's boards of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

95.     Attached as Exhibit 13.1 to the 2018 BPLC 20-F was a certification pursuant to

Section 906 of the Sarbanes-Oxley Act of 2002 signed by Defendants Staley and Morzaria, which

stated:

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), each undersigned officer of Barclays PLC, a public limited company incorporated under the laws of England and Wales ("Barclays"), hereby certifies, to such officer's knowledge, that:

The Annual Report on Form 20-F for the year ended December 31, 2019 (the "Report") of Barclays fully complies with the requirements of section 13(a) of the Securities Exchange Act of 1934 and information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Barclays.

96.    The statements in the 2018 BPLC 20-F and the attached certifications above in paragraphs ¶¶48-53 were untrue statements of material facts or failed to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, because:

(a) As of December 31, 2019, Barclays had a material weakness in its internal control environment due to the fact that it had no control in place to identify any over-issuance that occurred and would not be immediately identified; and

(b) They failed to disclose that (i) BBPLC may be selling unregistered securities in excess of the amounts registered by the 2018 and 2019 Shelf Registration Statements, (ii) BBPLC was violating U.S. securities laws and/or SEC regulations, and (iii) BBPLC would be required to conduct a recission offer for those unregistered securities.

***2018 BBPLC Annual Report on Form 20-F***

97.    On the same date, BBPLC filed its 2018 20-F. The 20-F was signed by Defendant Ewart. The 2018 BBPLC 20-F was incorporated by reference into the 2018 Shelf. Similar to Barclays, BBPLC represented that "[t]here have been no changes in the Barclays Bank Group's internal control over financial reporting which have materially affected or are reasonably likely to

materially affect the Barclays Bank Group's[44] internal control over financial reporting during the year."[45]

98.    Attached as Exhibit 12.1 to the 2018 BBPLC 20-F were certifications pursuant to 17 C.F.R. 240.13(A)-14(A) signed by Defendants Throsby and Ewart. The text of the certifications were identical to the certifications attached as Exhibit 12.1 to the 2018 Barclays 20- F, and were false for the same reasons.

99.    Attached as Exhibit 13.1 to the 2018 BBPLC 20-F was a certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 signed by Defendants Throsby and Ewart. The text of the certifications were identical to the certifications attached as Exhibit 13.1 to the 2018 BPLC 20-F, and were false for the same reasons.

*2019 BPLC Annual Report on Form 20-F*

100.    On February 18, 2020, Barclays filed the 2019 BPLC 20-F. The 2019 BPLC 20-F was signed by Defendant Morzaria.

101.    The 2019 BPLC 20-F described the Company's "robust internal controls" specifically stating that Company was on track to complete a three-year program at the end of March 2020, known as the Barclays Internal Control Environment Programme or "BICEP," that "was focus[ed] on strengthening the internal control environment," and had left the Company's internal controls environment "in a much stronger position.[46]

102.    The 2019 BPLC 20-F further stated that the Company "is committed to operating within a strong system of internal control," and lays out eight "Principal Risks…: Credit risk, Market risk, Treasury and Capital risk, Operational risk, Model risk, Reputation risk, Conduct risk

---

[44] Barclays Bank Group refers to Barclays Bank PLC together with its subsidiaries.
[45] 2018 BBPLC 20-F at 3.
[46] 2019 BPLC 20-F at 11.

and Legal risk." The 2019 BPLC 20-F went on to state that the Company's "frameworks, policies and standards enable Barclays to meet regulators' expectations relating to internal control and assurance."[47]

103.    The 2019 BPLC 20-F stated that the Barclays Board Audit Committee "concluded that, throughout the year ended 31 December 2019 and to date, the Group has operated a sound system of internal control that provides reasonable assurance of financial and operational controls and compliance with laws and regulations."[48]

104.    The 2019 BPLC 20-F also stated that "Management has assessed the internal control over financial reporting as of 31 December 2019. In making its assessment, management utilized the criteria set out in the 2013 COSO framework and concluded that, based on its assessment, the internal control over financial reporting was effective as of 31 December 2019."[49]

105.    Attached as Exhibit 12.1 to the 2019 BPLC 20-F were certifications pursuant to 17 C.F.R. 240.13(A)-14(A) signed by Defendants Staley and Morzaria, which stated:

1.  I have reviewed this annual report on Form 20-F of Barclays PLC;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4. The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and15d-15(f)) for the company and have:

---

[47] 2019 BPLC 20-F at 37.
[48] *Id*. at 38.
[49] *Id*.

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5. The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's boards of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

106.    Attached as Exhibit 13.1 to the 2019 BPLC 20-F was a certification pursuant to

Section 906 of the Sarbanes-Oxley Act of 2002 signed by Defendants Staley and Morzaria, which

stated:

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), each undersigned

officer of Barclays PLC, a public limited company incorporated under the laws of England and Wales ("Barclays"), hereby certifies, to such officer's knowledge, that:

The Annual Report on Form 20-F for the year ended December 31, 2019 (the "Report") of Barclays fully complies with the requirements of section 13(a) of the Securities Exchange Act of 1934 and information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Barclays.

107.    The statements in the 2019 BPLC 20-F and the attached certifications above in paragraphs ¶¶100-106 were untrue statements of material facts or failed to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, because:

(a) As of December 31, 2019, Barclays had a material weakness in its internal control environment due to the fact that it had no control in place to identify any over-issuance that occurred and would not be immediately identified; and

(b) They failed to disclose that (i) BBPLC may be selling unregistered securities in excess of the amounts registered by the 2018 and 2019 Shelf Registration Statements, (ii) BBPLC was violating U.S. securities laws and/or SEC regulations, and (iii) BBPLC would be required to conduct a recission offer for those unregistered securities.

***2019 BBPLC Annual Report on Form 20-F***

108.    On February 14, 2020, BBPLC filed its 2019 20-F ("2019 BBPLC 20-F").  The 20-F was signed by Defendant Ewart.  The 2019 BBPLC 20-F was incorporated by reference into the 2018 and 2019 Shelf.  Similar to Barclays, BBPLC represented that "[t]here been no changes in the Barclays Bank Group's internal control over financial reporting which have materially affected

or are reasonably likely to materially affect the Barclays Bank Group's[50] internal control over financial reporting during the year."[51]

109.   Attached as Exhibit 12.1 to the 2019 BBPLC 20-F were certifications pursuant to 17 C.F.R. 240.13(A)-14(A) signed by Defendants Staley and Ewart. The text of the certifications were identical to the certifications attached as Exhibit 12.1 to the 2019 Barclays 20- F, and were false for the same reasons.

110.   Attached as Exhibit 13.1 to the 2019 BBPLC 20-F was a certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 signed by Defendants Staley and Ewart. The text of the certifications were identical to the certifications attached as Exhibit 13.1 to the 2019 BPLC 20-F, and were false for the same reasons.

***2020 BPLC Annual Report on Form 20-F***

111.   On February 18, 2021, the same day that BBPLC exceeded the limit of registered securities under the August 2019 Shelf Registration Statement, Barclays filed the 2020 BPLC 20-F. The 2020 BPLC 20-F was signed by Defendant Morzaria.

112.   The 2020 BPLC 20-F described the Company's "robust internal controls" specifically stating that Company had recently "successfully completed" a three-year program, known as the Barclays Internal Control Environment Programme or "BICEP," that "was focus[ed] on strengthening the internal control environment across the Group," and had left the Company's internal controls environment "in a much stronger position."[52]

113.   The 2020 BPLC 20-F further stated that the Company "is committed to operating within a strong system of internal control," and lays out eight "Principal Risks…: Credit risk,

---

[50] Barclays Bank Group refers to Barclays Bank PLC together with its subsidiaries.
[51] 2019 BBPLC 20-F at 15.
[52] 2020 BPLC 20-F at 14.

Market risk, Treasury and Capital risk, Operational risk, Model risk, Reputation risk, Conduct risk and Legal risk." The 2020 BPLC 20-F went on to state that the Company's "frameworks, policies and standards enable Barclays to meet regulators' expectations relating to internal control and assurance."[53]

114.    The 2020 BPLC 20-F stated that the Barclays Board Audit Committee "concluded that, throughout the year ended 31 December 2020 and to date, the Group has operated a sound system of internal control that provides reasonable assurance of financial and operational controls and compliance with laws and regulations."[54]

115.    The 2020 BPLC 20-F also stated that "Management has assessed the internal control over financial reporting as of 31 December 2020. In making its assessment, management utilized the criteria set out in the 2013 COSO framework and concluded that, based on its assessment, the internal control over financial reporting was effective as of 31 December 2020."[55]

116.    Attached as Exhibit 12.1 to the 2020 BPLC 20-F were certifications pursuant to 17 C.F.R. 240.13(A)-14(A) signed by Defendants Staley and Morzaria, which stated:

1.  I have reviewed this annual report on Form 20-F of Barclays PLC;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4. The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules

---

[53] *Id.* at 39.
[54] *Id*.
[55] *Id*. at 40.

13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and15d-15(f)) for the company and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5. The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's boards of directors (or persons performing the equivalent functions):

All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

117.    Attached as Exhibit 13.1 to the 2020 BPLC 20-F was a certification pursuant to

Section 906 of the Sarbanes-Oxley Act of 2022 signed by Defendants Staley and Morzaria,

which stated:

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), each undersigned officer of Barclays PLC, a public limited company incorporated under the laws of England and Wales ("Barclays"), hereby certifies, to such officer's knowledge, that:

The Annual Report on Form 20-F for the year ended December 31, 2020 (the "Report") of Barclays fully complies with the requirements of section 13(a) of the Securities Exchange Act of 1934 and information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Barclays.

118.    The statements in the 2020 BPLC 20-F and the attached certifications above in paragraphs ¶¶111-117 were untrue statements of material facts or failed to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, because:

(a) As of December 31, 2020 and February 18, 2021, Barclays had a material weakness in its internal control environment due to the fact that the over-issuance had occurred and was not immediately identified; and

(b) They failed to disclose that as of February 18, 2021 (i) BBPLC had and was selling unregistered securities in excess of the amounts registered by the August 2019 Shelf Registration Statement, (ii) BBPLC was violating U.S. securities laws and/or SEC regulations; and (iii) BBPLC was required to conduct a recission offer for those unregistered securities.

### *2020 BBPLC Annual Report on Form 20-F*

119.    On February 18, 2021, BBPLC filed its 2020 20-F ("2020 BBPLC 20-F"). The 20-F was signed by Defendant Ewart. The 2020 BBPLC 20-F was incorporated by reference into the 2018 and 2019 Shelf. Similar to Barclays, BBPLC represented that "[t]here been no changes in the Barclays Bank Group's internal control over financial reporting which have materially affected

or are reasonably likely to materially affect the Barclays Bank Group's[56] internal control over financial reporting during the year."[57]

120.    Attached as Exhibit 12.1 to the 2020 BBPLC 20-F were certifications pursuant to 17 C.F.R. 240.13(A)-14(A) signed by Defendants Staley and Ewart. The text of the certifications were identical to the certifications attached as Exhibit 12.1 to the 2020 BPLC 20- F, and were false for the same reasons.

121.    Attached as Exhibit 13.1 to the 2020 BBPLC 20-F was a certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 signed by Defendants Staley and Ewart. The text of the certifications were identical to the certifications attached as Exhibit 13.1 to the 2020 BPLC 20-F, and were false for the same reasons.

122.    On April 30, 2021, Barclays issued its Q1 2021 Results Announcement, containing financial results for Barclays for the quarter ending March 31, 2021 ("Q1 2021 RA"). A copy of the Q1 2021 RA was attached as Exhibit 99.1 to a Form 6-K filed by Barclays with the SEC on April 30, 2021 ("April 30, 2021 Form 6-K").[58]

123.    The Q1 2021 RA represented that "Additional risks and factors which may impact the Group's future financial condition and performance are identified in our filings with the SEC (including, without limitation, our Annual Report on Form 20-F for the fiscal year ended 31 December 2020), which are available on the SEC's website at www.sec.gov."[59]

124.    The Q1 2021 RA and April 30, 2021 Form 6-K contained untrue statements of material facts or failed to state material facts necessary in order to make the statements made, in

---

[56] Barclays Bank Group refers to Barclays Bank PLC together with its subsidiaries.
[57] 2020 BBPLC 20-F at 14.
[58] Barclays Q1 2021 RA.
[59] Barclays Q1 2021 RA.

the light of the circumstances under which they were made, not misleading, because they failed to disclose that, as of March 31, 2021 and April 30, 2021, (a) BBPLC had and was selling unregistered securities in excess of the amounts registered by the August 2019 Shelf Registration Statement, (b) BBPLC was required to conduct a recission offer for those unregistered securities, (c) BBPLC was violating U.S. securities laws and/or SEC regulations; and (d) Barclays had a material weakness in its internal control environment due to the fact that the over-issuance had occurred and was not immediately identified.

125.    On July 28, 2021, Barclays issued its Interim 2021 Financial Results for the six month period ending June 30, 2021 ("Q2 2021 RA"). A copy of the Q2 2021 RA was attached as Exhibit 99.1 to a Form 6-K filed by Barclays with the SEC on July 28, 2021 ("July 28, 2021 6-K").[60]

126.    The Q2 2021 RA represented that "Additional risks and factors which may impact the Group's future financial condition and performance are identified in our filings with the SEC (including, without limitation, our Annual Report on Form 20-F for the fiscal year ended 31 December 2020), which are available on the SEC's website at www.sec.gov."[61]

127.    The Q2 2021 RA and July 28, 2021 Form 6-K contained untrue statements of material facts or failed to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, because they failed to disclose that, as of June 30, 2021 and July 28, 2021, (a) BBPLC had and was selling unregistered securities in excess of the amounts registered by the August 2019 Shelf Registration Statement, (b) BBPLC was required to conduct a recission offer for those unregistered securities, (c) BBPLC

---

[60] Barclays Q2 2021 RA.
[61] Barclays Q1 2021 RA at 4.

was violating U.S. securities laws and/or SEC regulations; and (d) Barclays had a material weakness in its internal control environment due to the fact that the over-issuance had occurred and was not immediately identified.

128.    On October 21, 2021, Barclays issued its Q3 2021 Results Announcement, containing financial results for the nine months ended September 30, 2021 ("Q3 2021 RA"). A copy of the Q3 2021 RA was attached as Exhibit 99.1 to a Form 6-K filed by Barclays with the SEC on October 21, 2021.[62]

129.    The Q3 2021 RA represented that "Additional risks and factors which may impact the Group's future financial condition and performance are identified in our filings with the SEC (including, without limitation, our Annual Report on Form 20-F for the fiscal year ended 31 December 2020), which are available on the SEC's website at www.sec.gov." [63]

130.    The Q3 2021 RA and October 21, 2021 Form 6-K contained untrue statements of material facts or failed to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, because they failed to disclose that, as of September 30, 2021 and October 21, 2021, (a) BBPLC had and was selling unregistered securities in excess of the amounts registered by the August 2019 Shelf Registration Statement, (b) BBPLC was required to conduct a recission offer for those unregistered securities, (c) BBPLC was violating U.S. securities laws and/or SEC regulations; and (d) Barclays had a material weakness in its internal control environment due to the fact that the over-issuance had occurred and was not immediately identified.

---

[62] Barclays Q3 2021 RA.
[63] Barclays Q3 2021 RA at 3.

*2021 BPLC Annual Report on Form 20-F*

131.    On February 23, 2022, Barclays filed the 2021 BPLC 20-F.[64] The Barclays 2021 20-F was signed by defendant Morzaria.

132.    In the 2021 BPLC 20-F, Barclays stated that the Audit Committee is charged with "Overseeing the integrity of our financial disclosures and the effectiveness of the internal control environment," and is "Keenly focused on the Group's internal control environment."[65]

133.    The 2021 BPLC 20-F further stated that Audit Committee "continued to oversee the ongoing evolution and enhancement of the internal control environment."[66]

134.    The 2021 BPLC 20-F stated that the Company "is committed to operating within a strong system of internal control," and laid out nine "Principal Risks…: Credit risk, Market risk, Treasury and Capital risk, Operational risk, Climate risk, Model risk, Reputation risk, Conduct risk and Legal risk." The 2021 BPLC 20-F went on to note that the Company's "frameworks, policies and standards enable Barclays to meet regulators' expectations relating to internal control and assurance."[67]

135.    The 2021 BPLC 20-F stated that the Barclays Board Audit Committee "concluded that, throughout the year ended 31 December 2021 and to date, the Group has operated a sound system of internal control that provides reasonable assurance of financial and operational controls and compliance with laws and regulations."[68]

136.    Additionally, the 2021 BPLC 20-F stated that "Management has assessed the internal control over financial reporting as at 31 December 2021…and concluded that, based on

---

[64] *See* 2021 BPLC 20-F.
[65] *Id*. at 22.
[66] *Id*.
[67] *Id*. at 45.
[68] *Id*.

its assessment, the internal control over financial reporting was effective as at 31 December 2021."[69]

137.    Attached as Exhibit 12.1 to the 2021 BPLC 20-F were certifications pursuant to 17 C.F.R. 240.13(A)-14(A) signed by Defendants Venkatakrishnan and Morzaria. The text of the certifications were identical to the certifications attached as Exhibit 12.1 to the 2020 BPLC 20- F (¶116).

138.    Attached as Exhibit 13.1 to the 2021 BPLC 20-F was a certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 signed by Defendants Venkatakrishnan and Morzaria. The text of the certification was identical to the certification attached as Exhibit 13.1 to the Barclays 2020 20-F (¶117).

139.    The statements in the 2021 BPLC 20-F and the attached certifications above in paragraphs ¶¶131-138 were untrue statements of material facts or failed to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, because:

(a) As of December 31, 2021 and February 23, 2022, Barclays had a material weakness in its internal control environment due to the fact that the over-issuance had occurred and was not immediately identified;

(b) They failed to disclose that, as of December 31, 2021 and February 23, 2022, (i) BBPLC had and was selling unregistered securities in excess of the amounts registered by the August 2019 Shelf Registration Statement, (ii) BBPLC was required to conduct a recission offer for those unregistered securities, and (iii) BBPLC was violating U.S. securities laws and/or SEC regulations.

---

[69] *Id*. at 46.

*2021 BBPLC Annual Report on Form 20-F*

140.    On February 23, 2022, BBPLC filed its 2021 20-F ("2021 BBPLC 20-F").  The 20-F was signed by Defendant Ewart.  The 2021 BBPLC 20-F was incorporated by reference into the 2018 and 2019 Shelf.  Similar to Barclays, BBPLC represented that "[t]here been no changes in the Barclays Bank Group's internal control over financial reporting which have materially affected or are reasonably likely to materially affect the Barclays Bank Group's[70] internal control over financial reporting during the year."[71]

141.    Attached as Exhibit 12.1 to the 2021 BBPLC 20-F were certifications pursuant to 17 C.F.R. 240.13(A)-14(A) signed by Defendants Venkatakrishnan and Ewart. The text of the certifications were identical to the certifications attached as Exhibit 12.1 to the 2020 Barclays 20-F, and were false for the same reasons.

142.    Attached as Exhibit 13.1 to the 2021 BBPLC 20-F was a certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 signed by Defendants Venkatakrishnan and Ewart. The text of the certifications were identical to the certifications attached as Exhibit 13.1 to the 2021 BPLC 20-F, and were false for the same reasons.

143.    On March 14, 2022, Barclays announced that it was suspending, until further notice, any further sale from inventory and any further issuances of the VXX ETNs, among others, because Barclays did not "currently have sufficient issuance capacity." However, at the time Barclays suspended sales of these ETNs and notified the SEC of the over-issuance, it did not publicly disclose the over-issuance.  Instead, Barclays stealthily noted that it "does not currently have sufficient issuance capacity to support further sales from inventory and any further issuance

---

[70] Barclays Bank Group refers to Barclays Bank PLC together with its subsidiaries.
[71] 2021 BBPLC 20-F at 13.

of the ETNs." Without a public disclosure of the over-issuance, and the massive amount of unregistered securities previously sold, the market was left in the dark for two more weeks.

**The Truth is Revealed**

144.    On March 28, 2022, before the market opened for the day, Barclays issued a press release and/or statement announcing that BBPLC had sold $15.2 billion of unregistered securities in excess of the maximum $20.8 billion of securities registered under the August 2019 Shelf Registration Statement, BBPLC would conduct a rescission offer, and that Barclays expected the rescission losses to be c. £450 million:

> ***BBPLC has determined that the securities offered and sold under its US shelf registration statement during a period of approximately one year exceeded the registered amount (such excess, the "Affected Securities")[Note 1] giving rise to a right of rescission among certain purchasers of Affected Securities requiring BBPLC to repurchase the Affected Securities at their original purchase price. As a result, BBPLC has elected to conduct a rescission offer to eligible purchasers of the Affected Securities. Details of the rescission offer will be published by BBPLC in due course.***

> Based on current market prices of the Affected Securities and the estimated pool of potentially eligible purchasers electing to participate in the rescission offer, Barclays expects the rescission losses (net of tax) to be c.£450m…

> Barclays has commissioned an independent review of the facts and circumstances relating to this matter including, among other things, the control environment related to such issuances. Separately, regulatory authorities are conducting inquiries and making requests for information….

> Note 1: ***In August 2019, BBPLC registered US$20.8bn in maximum aggregate offering price of securities (the "Registered Amount") and has exceeded the Registered Amount by approximately US$15.2bn.***[72]

145.    A copy of Barclays March 28, 2022 press release was filed by Barclays with the SEC on Form 6-K on March 28, 2022.

---

[72] *Barclays PLC and Barclays Bank PLC Impact of over-issuance under BBPLC US Shelf* (Mar. 28, 2022) (emphasis added).

146.     On April 28, 2022, before the market opened for the day, Barclays issued its Q1 2022 Results Announcement, which contained financial results for the three months ended March 31, 2022 ("Q1 2022 RA"). A copy of the Q1 2022 RA was filed by Barclays with the SEC as Exhibit 99.1 to a Form 6-K on April 28, 2022.[73]

147.     In the Q1 2022 RA, Barclays admitted that the securities sold in excess of the maximum aggregate amount were unregistered, and that there was the potential for civil claims and regulatory enforcement actions to be brought against BBPLC:

> Securities issued in excess of the limit are considered to be 'unregistered securities' for the purposes of US securities law with [] certain purchasers of those securities having the right to require [BBPLC] to repurchase those securities at their original purchase price with compensatory interest and the potential for the certain purchasers to bring civil claims and the SEC and other regulators to take enforcement actions against [BBPLC].[74]

148.     In the Q1 2022 RA, Barclays provided additional information on the over-issuance, including that BBPLC had started selling securities in excess of the $20.76 billion maximum aggregate amount registered under the August 2019 Shelf Registration Statement on February 18, 2021, and updated the public on reserves and liabilities related to the over-issuance:

> A contingent liability exists in relation to the c.US$2bn over issuance of ETNs due to evidentiary challenges and the high level of trading in the securities. A contingent liability also exists in relation to any potential claims or enforcement actions taken against Barclays Bank PLC but there is currently no indication of the timetable for resolution and it is not practicable to provide an estimate of the financial effects.[75]

149.     The Q1 2022 RA also confirmed what investors and the public already knew once the over-issuance was announced on March 28, 2022 – Barclays' internal controls were not effective and had a material weakness:

---

[73] Barclays Q1 2022 RA.
[74] *Id*. at 31.
[75] *Id*. at 31.

…management has concluded that, by virtue of the fact that the over-issuance occurred and was not immediately identified, both BPLC and BBPLC had a material weakness in relation to certain aspects of their internal control environment and, as a consequence, their internal control over financial reporting for the year ended 31 December 2021 was not effective under the applicable Committee of Sponsoring Organizations (COSO) Framework. The material weakness that has been identified relates to a failure to monitor issuances of structured notes and ETNs under BBPLC's US Shelf during the period in which BBPLC's status changed from a "well-known seasoned issuer" to an "ineligible issuer" for US securities law purposes, and BBPLC was required to pre-register a set amount of securities to be issued under its US Shelf with the SEC. As a result of this failure, BBPLC issued securities in excess of that set amount.[76]

150.    On May 4, 2022, Barclays held its 2022 Annual General Meeting (AGM), where Nigel Higgins, Chairman of Barclays, and Defendant Venkatakrishnan addressed investors in their 2022 AGM Statements.[77] In his 2022 AGM Statement, Higgins addressed the over issuance:

As I have said before, ***we do not get everything right***. Let me say a few words about our recently reported failure to comply with SEC registration requirements, a failure which has cost us hundreds of millions of pounds, and more in reputation. ***First, all of us here were dismayed that, after so much progress, we had this entirely self-inflicted problem. We have not yet finished the review but I believe that we will find that, in all our complexities, we missed some simple tasks. <u>This is not rocket science </u>*** and we can and will do better, learning the lessons from this particular issue and applying discipline across all of our controls. [(emphasis added).]

151.    Venkatakrishnan also addressed the over-issuance in his remarks on May 4, 2022:

Our strong performance in 2021 has carried over into the first quarter of this year, although we have seen a disappointing increase in costs. This has been driven in particular by the over securities in the US, which Nigel talked about. Let me echo his comments. ***This situation was entirely avoidable and I am deeply disappointed that it occurred.***

The necessity of a strong controls culture has never been clearer to me. ***In fact, we have made considerable progress improving our controls since 2016. So the fact that this happened is particularly upsetting***. [(emphasis added).]

---

[76] *Id*.
[77] Barclays 2022 AGM Statement.

152.    Higgins' and Venkatakrishnan's admissions that the over-issuance was entirely avoidable, that it was a simple control that was not in place, and that it was not "rocket science" to stop the over-issuance from taking place, evidences that the Defendants and the other officers and directors responsible for ensuring adequate internal controls over financial reporting were severely or deliberately reckless in not ensuring internal controls were in place to stop the over-issuance.

153.    On May 23, 2022, both BPLC and BBPLC filed amendments to their 2021 annual reports on Forms 20-F with the SEC including the restatements. The restatements reflected a £220 million litigation and conduct provision and an associated income statement charge as of year-end 2021 and a contingent liability disclosure, all with respect to the potential impact of the over-issuance from the 2019 Shelf. The restatements also amended disclosures to reflect that internal control over financial reporting and disclosure controls and procedures were not effective as of year end 2021, due to a material weakness identified after the original filing date as a result of the over issuance from the 2019 Shelf.

154.    On July 25, 2022, before the market for Barclays ETNs opened for the day, Barclays issued a press release announcing that BBPLC was expected to commence the rescission offer on August 1, 2022 for a total of approximately "$17.6 billion of relevant securities issued in excess of amounts registered by BBPLC under its U.S. shelf registration statements. Such securities consist of c.U.S.$14.8 billion of structured notes and c.U.S.$2.8 billion of exchange traded notes."[78] A copy of the July 25, 2022 press release was filed by Barclays with the SEC on Form 6-F on July 25, 2022.

---

[78] See Barclays Bank PLC to Commence Rescission Offer (July 25, 2022).

155.     On July 28, 2022, before the trading opened for the day, Barclays issued interim financial results for the six month period ending June 30, 2022 ("Q2 2022 RA").[79] A copy of the Q2 2022 RA was filed by Barclays with the SEC on as Exhibit 99.1 to a Form 6-F on July 28, 2022.

156.     In the Q2 2022 RA, Barclays informed investors that BBPLC had also over-issued unregistered securities under a second shelf registration statement: "while the vast majority of the over-issuance occurred under the [August 2019 Shelf Registration Statement], a small portion of the over-issuance also occurred under the Predecessor Shelf [the March 2018 Shelf Registration Statement]."[80]

157.     On August 1, 2022, before trading in Barclays ETNs had opened for the day, BBPLC filed a Form 424B5 with the SEC and commenced a recission offer for $17.6 billion overissued securities ("Recission Offer") that were sold pursuant to the March 2018 Shelf Registration Statement and August 2019 Shelf Registration Statement, whereby BBPLC has offered "to repurchase the applicable securities from relevant purchasers who acquired such securities, at their purchase price plus interest, less the amount of any interest, coupon payments, principal or other income received pursuant to the terms of the securities, or to pay rescissory damages if such securities, after being purchased, were sold, redeemed or matured at a loss."[81]

158.     The August 1, 2022 rescission offer disclosed that from February 18, 2021 through March 14, 2022, BBPLC sold approximately $16.37 billion of unregistered securities in excess of

---

[79] Barclays Q2 2022 RA.
[80] *Id.* at 30.
[81] BBPLC Recission Offer (Aug. 1, 2022) ("BBPLC Recission Offer"), at S-6.

the maximum $20.8 billion of securities registered under the August 2019 Shelf Registration Statement (for a total of approximately $37 billion).[82]

159.    The August 1, 2022 rescission offer also disclosed that BBPLC sold an additional $1.27 billion of unregistered securities in excess of the maximum aggregate amount registered pursuant to the March 2018 Shelf Registration Statement.[83]

160.    The Recission Offer further disclosed that the subject ETNs were not "readily distinguishable from ETNs of the same series that were properly offered and sold" because the ETNs were placed in Barclays DTC account and "existed as a fungible pool" with the same CUSIP. For this reason, in addition to over issuing said securities, Barclays also had no way of tracing which ETNs were registered or unregistered.

161.    The Rescission Offer also stated that ETN investors would "face ***significant evidentiary issues that are likely to make it difficult, if not impossible,*** for such investors to present sufficient evidence to prove that they meet the eligibility requirements to be considered an Eligible Investor and participate in this Rescission Offer." (Emphasis added).

162.    Due to these evidentiary issues, nearly all submitted claims were rejected by Barclays because it could not verify whether ETNs were registered or unregistered, regardless of the amount of evidence investors submitted.

163.    After trading had been halted for months, followed by Barclays refusal to honor its promised Rescission Offer, investors were left with ETNs that had little to no value.

164.    On September 12, 2022 the recission offer ended and many investors were left holding the bag. The price of VXX had fallen to $72.60.

---

[82] *Id*.
[83] *Id*.

165.    On September 19, 2022, after the failed Recission Offer, Barclays began issuing additional shares of VXX and the price of VXX further dropped to $71.96, a mere fraction of the class period high of $1,261.44.

166.    By the end of the Class Period, Barclays failures caused VXX to sustain markets losses of more than $1.5 billion, leaving Plaintiff and other VXX investors with significant damages.

## CLASS ACTION ALLEGATIONS

167.    Plaintiff bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons who purchased or otherwise acquired Barclays VXX ETNs on a U.S. open market during the class period February 21, 2019 through September 12, 2022, both dates inclusive (the "Class"). Excluded from the Class are Defendants in this action, the officers and directors of the Company during the Class Period (the Excluded D&Os), members of Defendants' and Excluded D&Os' immediate families, legal representatives, heirs, successors or assigns, and any entity in which Defendants or the Excluded D&Os have or had a controlling interest.

168.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.

169.    Throughout the Class Period, Barclays ETNs actively traded on the CBOE (an open and efficient market) under the symbol "VXX." Millions of Barclays ETNs were traded publicly during the Class Period on the CBOE.

170.    As of August 12, 2022, the Company had more than 183 million ETNs outstanding. Record owners and other members of the Class may be identified from records maintained by Barclays or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

171.    Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

172.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff have no interests that conflict with those of the Class.

173.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

(b) whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(c) whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders by Defendants during the Class Period misrepresented or omitted material facts about Barclays' internal controls, business, operations, and financial statements, or BBPLC's issuance of unregistered securities;

(d) whether the market price of Barclays ETNs during the Class Period was artificially inflated and/or maintained due to the material misrepresentations or omissions and/or

failures to correct the material misrepresentations or omissions complained of herein; and

(e) the extent to which the members of the Class have sustained damages and the proper measure of damages.

174.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

175.    Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## ADDITIONAL SCIENTER ALLEGATIONS

176.    As alleged herein, Defendants acted with scienter in that Defendants knew or were reckless as to whether the public documents and statements issued or disseminated by Defendants during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

177.    Among other things, the Individual Defendants, and other Barclays' officers and directors who were responsible for creating and overseeing Barclays' internal controls over financial reporting, failed to install "simple" control procedures to ensure that the "entirely avoidable" over-issuance of billions of dollars of unregistered securities above the maximum amount of securities registered under Barclays March 2018 and August 2019 Shelf Registration

Statements did not occur. As admitted by Nigel Higgins, Chairman of Barclays, "this is not rocket science."

178.     Given the potential exposure to the securities laws and legal liability from the over-issuance of securities, the failure to have such simple control procedures in place to account for the number of securities issued against the number of securities registered is such an elementary failure of internal control that is so obvious as to be deliberately reckless.

179.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Barclays, their control over, receipt, and/or modification of Barclays' allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning Barclays, participated in the fraudulent scheme alleged herein.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

180.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

181.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or

misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Barclays who knew that the statement was false when made.

## LOSS CAUSATION

182. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, i.e., damages, suffered by Plaintiff and the Class.

183. During the Class Period, as detailed herein, Defendants made untrue statements of material facts or failed to disclose information necessary to make the statements made by Defendants not misleading. This artificially inflated and/or maintained the prices of Barclays ETNs and operated as a fraud or deceit on the Class.

184. When Defendants' prior material false statements and material omissions, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of Barclays ETNs fell precipitously, as the prior artificial inflation came out of the price.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

185. The market for Barclays ETNs was open, well-developed, and efficient at all relevant times.

186. Further, the market for Barclays' VXX ETNs was open, well-developed, and efficient at all relevant times.

187. As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this Complaint, Barclays ETNs traded at artificially inflated and/or maintained prices during the Class Period. Plaintiff and other members of the Class purchased the Company's ETNs relying upon the integrity of the market price of Barclays ETNs and market information relating to Barclays and have been damaged thereby.

188.    At all times relevant, the market for Barclays ETNs was an efficient market for the following reasons, among others:

(a)    Barclays ETNs were listed and actively traded on CBOE a, a highly efficient and automated market;

(b)    As a regulated issuer, Barclays filed periodic public reports with the SEC and/or the CBOE;

(c)    Barclays regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Barclays was followed by securities analysts employed by brokerage firms, including UBS, Credit Suisse, Bank of America, Jeffries, Deutsche Bank, JP Morgan, and BNP Paribas, who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

189.    As a result of the foregoing, the market for Barclays ETNs promptly digested current information regarding Barclays from all publicly available sources and reflected such information in the prices of the ETNs. Under these circumstances, all purchasers of Barclays ETNs during the Class Period suffered similar injury through their purchase of Barclays ETNs at artificially inflated and/or maintained prices, and a presumption of reliance applies.

190.    Therefore, Plaintiff and the Class are entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

191.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded in Defendants' omissions of material facts necessary to make the statements made by Defendants not misleading, including but not limited to the fact that BBPLC was selling unregistered securities in excess of the maximum amount of securities registered under the August 2019 Shelf Registration Statement and Barclays' internal controls over financial reporting were ineffective and did not stop the over-issuance.

192.    Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects - information that Defendants were obligated to disclose during the Class Period but did not - positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## THE STATUTE OF REPOSE HAS NOT EXPIRED

193.    Section 13 of the Securities Act of 1933 provides that all claims under the Securities Act must be brought within one year of the discovery of the violation and within three years after the security was offered to the public.

194.    The three-year statute of repose under the Securities Act has not expired on untrue statements of material fact contained in the Registration Statements because defendants incorporated by reference Forms 20-F on, February 21, 2019 –2018 BBPLC 20-F, February 18, 2020 – 2019 BBPLC 20-F, and February 18, 2021 – 2020 BBPLC 20-F, into the registration statements.

195.    On February 22, 2018, Barclays filed an amended registration statement (Form F-3) to convert its prior 2016 WKSI shelf to a non-WKSI shelf (the "2018 Shelf"), which was declared effective on March 30, 2018.[84]  Item 6 of Form F-3 requires the incorporation by reference of all subsequent annual reports filed under the Exchange Act prior to the termination of the offering.[85]    Accordingly, on Barclays Form F-3, in a section entitled "INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE," it states "future documents that we may file with the SEC under Section 13(a), 13(c), 14 or 15(d) of the Exchange Act from the date of this prospectus until any offering contemplated in this prospectus is completed" is incorporated by reference into this prospectus.  The Form 20-F, used for annual reports pursuant to Section 13 or 15(d) of the Securities Exchange Act, qualifies as one of such documents incorporated by reference into the Form F-3 registration statement. When BBPLC filed its Forms 20-F on, February 21, 2019 –2018 BPLC 20-F, February 18, 2020 – 2019 BBPLC 20-F, and February 18, 2021 – 2020 BBPLC 20-F, Barclays incorporated by reference the annual reports into the Form F-3 registration statement.

196.    In Item 10 of the registration statement, in a section entitled "undertakings," states that BBPLC:

> for purposes of determining any liability under the Securities Act, each filing of
> the Registrant's annual report pursuant to Section 13(a) or 15(d) of the Exchange
> Act (and, where applicable, each filing of an employee benefit plan's annual
> report pursuant to Section 15(d) of the Securities Exchange Act) that is
> incorporated by reference in the Registration Statement shall be deemed to be a
> new Registration Statement relating to the securities offered therein, and the

---

[84] *See* Barclays' March 2018 Shelf Registration Statement (Mar. 30, 2018), available at www.sec.gov/Archives/edgar/data/312070/000119312518098676/d450194dposam.htm; Notice of Effectiveness (Mar. 30, 2018), available at www.sec.gov/Archives/edgar/data/312070/999999999518000718/xslEFFECTX01/primary_doc.xml.
[85] https://www.sec.gov/files/formf-3.pdf

offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

197.    Accordingly, the BBPLC Forms 20-F were incorporated into the registration statement, and under Item 10 of Form F-3, the relevant date is therefore the filings of the Form 20-F.  BBPLC filed its 2020 Form 20-F on February 18, 2021, which is within the three-year statute of repose.

## COUNT I
### Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against the Exchange Act Defendants)

198.    Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

199.    This Count is asserted pursuant to § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC, on behalf of Plaintiff and the Class, against Barclays and the Individual Defendants.

200.    During the Class Period, Defendants carried out a plan that was intended to, and did: (a) deceive the investing public, including Plaintiff and the Class; and (b) artificially manipulate the price of Barclays' ETNs.

201.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of conduct that operated as a fraud and deceit upon purchasers of Barclays' ETNs in violation of § 10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

202.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal the adverse material information as specified herein.

203.   Defendants' liability arises from the fact that they developed and engaged in a scheme to manipulate the price of Barclays' ETNs and were aware of the dissemination of information to the investing public that they knew or recklessly disregarded was materially false and misleading.

204.   Defendants had actual knowledge of the misrepresentations, omissions, and deceptive conduct alleged herein, or acted with reckless disregard for the truth.  Defendants' acts were done for the purpose and effect of concealing the scheme alleged herein from the investing public, and to artificially manipulate the market price of Barclays' ETNs.

205.   By virtue of the foregoing, Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

206.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of Barclays' ETNs during the Class Period.

## COUNT II
### Violation of § 20(a) of the Exchange Act
### (Against Section 20(a) Defendants)

207.   Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

208.   This Count is asserted pursuant to § 20(a) of the Exchange Act, on behalf of Plaintiff and the Class, against the Individual Defendants and the Section 20(a) Defendants.

209.    As alleged above, Barclays violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making materially false and misleading statements and omitting material information in connection with the purchase of Barclays' ETNs.

210.    This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of each of the Individual Defendants and Section 20(a) Defendants who knew of or acted with reckless disregard of the falsity of their statements and the fraudulent nature of its scheme during the Class Period.

211.    As set forth above, the Individual Defendants had control over Barclays and made the materially false and misleading statements and omissions on behalf of Barclays within the meaning of § 20(a) of the Exchange Act as alleged herein.  By virtue of their executive positions and their culpable participation, as alleged above, the Individual Defendants had the power and influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends were false and misleading.  The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

212.    In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

213.    Likewise, the Section 20(a) Defendants are liable as control persons under Section 20(a) for Barclays' violations of Section 10(b).  At all relevant times, Ewart and Throsby, BBPLC's

CFO and CEO of Barclays' wholly-owned U.S. subsidiary where the over-issuances at issue in this action occurred. Following the May 2017 loss of WKSI status for Barclays, Defendants Ewart and Throsby oversaw the August 2022 rescission offer for those over-issued securities, and which was subject to the subsequent SEC cease- and-desist order, on September 29, 2022, which included, among other penalties, a $200 million penalty.

214.    Similarly, for the entirety of the Class Period, Defendant Higgins was Group Chairman at Barclays. When he became Group Chairman in 2019, Barclays was an ineligible issuer without WKSI privileges as a result of the May 2017 SEC Settlement; yet, under Defendant Higgins' watch, as admitted by Barclays and Defendant Higgins himself (¶150), Barclays failed to establish any internal controls to track securities issuances from its non-WKSI shelves in real-time, which was not "rocket science." Defendant Higgins served as Group Chairman at Barclays during the over-issuance, the investigation into the over-issuance, the Company's rescission offer to customers who purchased unregistered securities from Barclays in August and September 2022; and the SEC's investigation and ultimate September 29, 2022 settlement order with Barclays as a result of the over-issuance, for which Barclays paid a $200 million penalty.

215.    By reasons of such wrongful conduct, Individual Defendants and the Section 20(a) Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's ETNs during the Class Period.

### COUNT III
**Violation of § 11 of the Securities Act**
**(Against the Securities Act Defendants)**

216.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

217.    This count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against the Securities Act Defendants. This is a non-fraud cause of action for negligence. Plaintiff does not assert that defendants committed intentional or reckless misconduct or that defendants acted with scienter or fraudulent intent.

218.    The 2019 Shelf was inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state facts required to be stated therein.

219.    The defendants named in this count are strictly liable to Plaintiff and the Class for the misstatements and omissions.

220.    BBPLC was the registrant for the VXX ETNs. As the issuer of the VXX ETNs, BBPLC is strictly liable to Plaintiff for the misstatements and omissions.

221.    None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the 2019 Shelf were true and without omissions of any material facts and were not misleading.

222.    By reason of the conduct alleged herein, each defendant named herein violated and/or controlled a person who violated Section 11 of the Securities Act, 15 U.S.C. § 77k.

223.    Plaintiff and members of the Class purchased VXX ETNs traceable to the 2019 Shelf.

224.    Plaintiff has sustained damages. The value of the VXX ETN has declined substantially subsequent to and due to Barclays' violations as set forth above.

225.    At the time of their purchases of VXX ETNs, Plaintiff was without knowledge of the facts concerning the violations described above.

226.     Fewer than three years have elapsed between the time that the securities upon which this claim is brought were offered to the public and the time Plaintiff will have filed this complaint.

### COUNT IV
**Unregistered Offer and Sale of Securities in Violation of**
**Sections 5 and 12(a)(1) of the Securities Act of 1933**
**(Against the Securities Act Defendants)**

227.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

228.     This count is brought pursuant to Sections 5 and 12(a)(1) of the Securities Act, 15 U.S.C. § 77e and § 77l, on behalf of the Class, against the Securities Act Defendants. This is a non-fraud cause of action for negligence. Plaintiff does not assert that defendants committed intentional or reckless misconduct or that defendants acted with scienter or fraudulent intent.

229.     15 U.S.C. § 77e(a) (Section 5(a) of the '33 Act) states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."

230.     15 U.S.C. § 77e(c) (Section 5(c) of the '33 Act) states: "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or

stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title."

231.   15 U.S.C. § 77l (a) (Section 12(a) of the Securities Act) states that any person that "offers or sells a security in violation of section 77e, or … section 77c of this title . . . shall be liable, subject to subsection (b), to the person purchasing such security from him."

232.   During the class period, Defendants directly and indirectly: (a) without a registration statement in effect as to that security, made use of the means and instruments of transportation or communications in interstate commerce or of the mails to sell the iPath Series B S&P 500 VIX Short-Term Futures ETN (VXX) through the use or medium of any prospectus or otherwise, (b) without a registration statement in effect as to that security, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale, and (c) made use of the means and instruments of transportation or communication in interstate commerce or of the mails to offer to sell through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

233.   As a direct and proximate result of Defendants' unregistered sale of securities, Plaintiff and members of the class have suffered damages in connection with their respective purchases of iPath Series B S&P 500 VIX Short-Term Futures ETNs (VXX).

234.   As a result of their conduct, Defendants are liable to Plaintiff and other class members for damages or recission, as well as costs, attorneys' fees, and interest.

## COUNT V
### For Violation of Section 12(a)(2) of the Securities Act
### (Against the Securities Act Defendants)

235.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

236.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of the Class, against all Defendants. This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of §12(a)(2), and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

237.     Each of the Defendants named in this Count were sellers, offerors, or solicitors of purchases of the Company's common securities pursuant to the defective 2019 Shelf Registration, which incorporated Form 20-F.  The actions of solicitation by the Securities Act Defendants include participating in the preparation of the false and misleading 2019 Shelf Registration and marketing the securities to investors, such as Plaintiff and other members of the Class.

238.     The Shelf Registration contained untrue statements of material fact, omitted to state other facts necessary to make statements made therein not misleading, and omitted to state material facts required to be stated therein.

239.     Each of the Securities Act Defendants owed Plaintiff and other members of the Class who purchased or otherwise acquired iPath Series B S&P 500 VIX Short-Term Futures ETN (VXX) pursuant to the 2019 Shelf Registration a duty to make a reasonable and diligent investigation of the statements contained in the 2019 Shelf Registration Statement to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. By virtue of each of the Securities Act Defendants' failure to exercise reasonable care, the 2019 Shelf Registration

contained misrepresentations of material fact and omissions of material fact necessary to make the statements therein not misleading.

240.    Plaintiff and the members of the Class did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the prospectuses issued in connection with the 2019 Shelf Registration at the time they purchased or otherwise acquired iPath Series B S&P 500 VIX Short-Term Futures ETN (VXX) securities.

241.    By reason of the conduct alleged herein, the Defendants violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased or otherwise acquired iPath Series B S&P 500 VIX Short-Term Futures ETN (VXX) pursuant to the prospectuses issued in connection with the Offering Materials sustained substantial damages in connection therewith. Accordingly, Plaintiff and the other members of the Class who hold the securities issued pursuant to the prospectuses issued in connection with the Offering Materials have the right to rescind and recover the consideration paid for their securities with interest thereon or damages as allowed by law or in equity. Class members who have sold their iPath Series B S&P 500 VIX Short-Term Futures ETN (VXX) securities seek damages to the extent permitted by law.

**COUNT VI**
**Violation of Section 15 of the Securities Act**
**(Against Defendants Staley, Morzaria, Higgins, Ewart, and Throsby)**

242.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

243.    This Count is asserted against Defendants Staley, Morzaria, Higgins, Ewart, and Throsby (collectively, the "Securities Act Control Person Defendants") for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiff and the other members of the Class

who purchased or otherwise acquired iPath Series B S&P 500 VIX Short-Term Futures ETN (VXX) pursuant or traceable to the registration and were damaged thereby.

244.    The Securities Act Control Person Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Barclays within the meaning of Section 15 of the Securities Act. The Securities Act Control Person Defendants had the power and influence and exercised the same to cause BBPLC to engage in the acts described herein.

245.    The Securities Act Control Person Defendants at all relevant times participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of BBPLC's business affairs. As officers and directors of a publicly owned company, the Securities Act Control Person Defendants had a duty to disseminate accurate and truthful information with respect to Barclays's financial condition and results of operations. Because of their positions of control and authority as officers or directors of BPLC and BBPLC, the Securities Act Control Person Defendants were able to, and did, control the contents of the registrations, which contained materially untrue financial.

246.    By reason of the aforementioned conduct, each of the Securities Act Control Person Defendants is liable under Section 15 of the Securities Act, jointly and severally, to Plaintiff and the other members of the Class. As a direct and proximate result of the conduct of BBPLC and the Securities Act Control Person Defendants, Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of iPath Series B S&P 500 VIX Short-Term Futures ETN (VXX).

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of the Class, pray for relief and judgment as follows:

A. Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B. Determining and declaring that Defendants violated the Exchange Act, as charged in Counts I-II, by reason of the acts, omissions and, status of control alleged herein;

C. Determining and declaring that Defendants violated the Securities Act, as charged in Counts III-VI, by reason of the acts, omissions and, status of control alleged herein;

D. Awarding Plaintiff and the other members of the Class recission or damages in an amount that may be proven at trial, together with interest thereon;

E. Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

F. Awarding such other relief as this Court deems appropriate.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: June 9, 2023.                     Respectfully Submitted,


**RIGRODSKY LAW, P.A.**

By:  */s/ Timothy J. MacFall*
     Seth D. Rigrodsky
     Timothy J. MacFall
     Gina M. Serra
     Vincent A. Licata
     825 East Gate Boulevard, Suite 300
     Garden City, NY 11530
     Telephone: (516) 683-3516
     Email: sdr@rl-legal.com
           tjm@rl-legal.com
           gms@rl-legal.com
           vl@rl-legal.com

*Local Counsel for Plaintiff and the Class*


*/s/ Alan L. Rosca*
Alan L. Rosca
**ROSCA SCARLATO LLC**
Alan L. Rosca (*pro hac vice forthcoming*)
2000 Auburn Drive, Suite 200
Beachwood, OH 44122
Telephone: (216) 946-7070
Email: arosca@rscounsel.law

Paul Scarlato (*pro hac vice forthcoming*)
Kathryn Weidner (*pro hac vice forthcoming*)
161 Washington Street, Suite 1025
Conshohocken, PA 19428
Email: pscarlato@rscounsel.law
Email: kweidner@rscounsel.law

*Counsel for Plaintiff and the Class*